DECISION
{¶ 1} Relator, William H. Asburay, has filed an original action requesting this court to issue a writ of mandamus ordering respondent, Industrial Commission of Ohio, to vacate its order, which terminated permanent total disability ("PTD") compensation and declared an overpayment, and to enter an order reinstating PTD compensation.
 {¶ 2} We referred this matter to a magistrate pursuant to Civ. R. 53(C) and Loc. R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision, *Page 2 
including findings of fact and conclusions of law, recommending that this court deny the requested writ. (Attached as Appendix A.) Relator has filed objections to the magistrate's decision. To resolve those objections, we briefly summarize the facts.
 {¶ 3} In 1996, the commission awarded relator PTD compensation. At that time, the commission found that relator was unable to engage in sedentary work or to be retrained to perform sedentary work.
 {¶ 4} In 2001, relator was incarcerated. Investigators obtained information concerning relator's incarceration, including his medical condition and work assignments. Investigators learned that relator was paid for various positions, including porter, food service worker, and pan room coordinator. They also learned that relator was participating in an academic program. Based on this information, Edward L. Mitchell, M.D., concluded that relator was capable of sustained remunerative employment.
 {¶ 5} A staff hearing officer ("SHO") of the commission held a hearing on December 5, 2002, but neither relator nor his attorney appeared. The SHO issued an order that terminated PTD compensation and declared an overpayment of benefits paid after December 28, 2001.
 {¶ 6} On February 7, 2007, relator moved for relief pursuant to R.C. 4123.522 and 4123.52. He claimed that he did not receive notice of the December 5, 2002 hearing and did not receive the SHO's order resulting from the hearing.
 {¶ 7} In an April 4, 2007 order, an SHO denied relator's motion, but the commission granted reconsideration. In an order mailed on June 29, 2007, the commission found that relator had conceded in an affidavit that the notice of the *Page 3 
December 5, 2002 hearing was sent to the proper address and, on that basis, denied relator's request for a new hearing. Nevertheless, the commission found that the December 5, 2002 SHO order, which terminated relator's PTD compensation and declared an overpayment, was sent to an incorrect address. On that basis, the commission vacated the April 4, 2007 order denying relief under R.C. 4123.522 and granted relator "the opportunity to file a request for reconsideration within 14 days after receipt of this order pursuant to Commission Resolution R05-1-02."
 {¶ 8} Relator filed a request for "reconsideration of the Staff Hearing Officer's order mailed 4/4/2007 as containing a clear mistake of fact." Relator presented no arguments to support reconsideration of the December 2002 order terminating relator's PTD compensation. Instead, relator argued that the April 2007 order contained a mistake of fact, i.e., the finding that relator had received notice of the December 2002 hearing, and argued for a new hearing on that basis. In an order dated November 24, 2007, the commission denied relator's reconsideration request because it did not conform to Commission Resolution R05-1-02, which prescribes guidelines for requests for reconsideration.
 {¶ 9} Relator filed a complaint for mandamus relief in this court on January 9, 2008. Relator argued that the December 2002 order contained mistakes of law and fact. Relator stated that he had moved for reconsideration in response to the commission's June 29, 2007 order and that the commission had "refused to respond or act in any way regarding this request." For relief, relator asked for a writ ordering the commission to vacate the December 5, 2002 order terminating relator's PTD compensation. *Page 4 
 {¶ 10} In his brief submitted to the magistrate, relator raised the following two issues: (1) the commission erred by terminating the PTD compensation of an incarcerated injured worker; and (2) the commission erred by terminating PTD compensation without informing the recipient of the commission's exercise of continuing jurisdiction. The magistrate resolved relator's second issue in Finding of Fact No. 22, which states that, "[o]n November 24, 2007, the commission mailed an order denying relator's July 13, 2007 request for reconsideration." Based on a comprehensive analysis of applicable case law, the magistrate also concluded that relator's incarceration did not preclude the commission from terminating his PTD compensation, thus resolving relator's first issue. The magistrate recommended that we deny the requested writ.
 {¶ 11} Relator has filed objections to the magistrate's decision, and he has done so in an unnecessarily caustic and unprofessional manner. We reject out of hand his accusations concerning the magistrate's abilities.
 {¶ 12} Relator asserts that the magistrate failed to address his argument that the commission's failure to act on his request for reconsideration denied him his rights to due process. As we noted, the magistrate's findings of fact include a finding that the commission did respond to relator's request. Exhibit 1 of the Stipulations to the Record filed in this case is a copy of the commission's November 24, 2007 order, which expressly denies relator's request because it did not conform to commission guidelines, and which indicates that the order was mailed to both relator and his counsel at the addresses they provided in their request. The record itself establishes that relator has no basis for his continued assertion that "the Commission has not responded. The *Page 5 
Commission has not denied the request nor granted it but instead has opted to leave [relator] in limbo without any form of redress." We overrule this objection.
 {¶ 13} Relator also argues that his rights were violated when the December 5, 2002 hearing went forward without proper notice to him, and he asks for a new hearing. Relator does not, however, address the commission's reason for denying relator's request for a new hearing. In its June 29, 2007 order, the commission found, and relator's affidavit in support of his request for reconsideration confirms, that the commission sent the notice to his correct address and that, based on relator's own testimony, he had received other mail at that address. On these grounds, the commission concluded that relator had not rebutted the presumption that he had received notice, and they denied relief under R.C. 4123.522. The commission's conclusion was well founded.
 {¶ 14} R.C. 4123.522 provides "a rebuttable presumption, sometimes called the `mailbox rule' that, once a notice is mailed, it is presumed to be received in due course." Weiss v. Ferro Corp. (1989),44 Ohio St.3d 178, 180. In order to successfully rebut that presumption, the party alleging the failure to receive notice must prove the following: "(1) [T]he failure of notice was due to circumstances beyond the party's or the party's representative's control, (2) the failure of notice was not due to the party's or the party's representative's fault or neglect, and (3) neither the party nor the party's representative had prior actual knowledge of the information contained in the notice." State exrel. LTV Steel Co. v. Indus. Comm., 88 Ohio St.3d 284, 286,2000-Ohio-328.
 {¶ 15} Relator did not address the mailbox rule in his brief to the magistrate or in his objections to this court. Because relator offered no argument in opposition to the *Page 6 
commission's only stated reason for denying relator's request for a hearing, we overrule relator's objection on these grounds.
 {¶ 16} Having conducted an independent review of the evidence in this matter, and having overruled relator's objections, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained in it. In accordance with the magistrate's decision, we deny the requested writ.
Objections overruled, writ of mandamus denied.
 KLATT and TYACK, JJ., concur. *Page 7 
 APPENDIX A MAGISTRATE'S DECISION Rendered August 28, 2008 IN MANDAMUS {¶ 17} In this original action, relator, William H. Asburay, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order terminating permanent total disability ("PTD") compensation and declaring an overpayment, and to enter an order reinstating PTD compensation.
Findings of Fact: {¶ 18} 1. On October 28, 1976, relator sustained an industrial injury while employed as a "chain man" for Armstrong Drilling, Inc., a state-fund employer. The *Page 8 
industrial claim was allowed for "low back injury; anxiety disorder with depression," and assigned claim number 76-33017.
 {¶ 19} 2. Following a May 15, 1996 hearing, a commission staff hearing officer ("SHO") issued an order awarding relator PTD compensation beginning May 15, 1996. The SHO's order of May 15, 1996 explains:
 This order is based particularly upon the reports of Drs. Ross, Hunter and Hoover.
 Dr. Ross, Claimant's physician's report dated 1-5-96 was relied upon. Dr. Ross is claimant's treating physician with respect to the low back injury. Dr. Ross indicates claimant is not capable of sustained remunerative employment.
 Dr. Hunter, Industrial Commission of Ohio specialist's report dated 10-11-95 was also relied upon. Dr. Hunter examined the lumbar spine and found claimant unable to heel-toe walk because of balance. Claimant had 45 degrees of forward flexion and 10 degrees of extension. There was 20 degrees of right and left lateral bending and 20 degrees of right and left lateral rotation. Dr. Hunter opined claimant would not be able to return to his former position of employment as a chain man because of the lifting, standing and bending required. Dr. Hunter indicated the decreased range of motion of the lumbar spine and continued low back pain prohibits claimant from performing work as a chain man. Claimant currently undergoes two physical therapy treatments per week for the low back condition.
 The Staff Hearing Officer finds claimant is 48 years of age and has completed the seventh grade. Claimant's entire work history consists of heavy, physical labor. Claimant has worked as a chain man, tire changer and farmer. Claimant has never had any vocational training and indicated at hearing he can not read, write or spell.
 The Hearing Officer finds given claimant's limited education, cognitive abilities and physical restrictions imposed by Dr. Hunter, the claimant does not possess the ability to be retrained or perform even sedentary work. Dr. Hunter opines claimant is not able to drive a standard gear shift automobile, drive a truck, forklift or operate equipment from a standing *Page 9 
position. Claimant, per Dr. Hunter is also precluded from bending, climbing, crawling or lifting any weight greater than five pounds. In addition to these significant physical restrictions, the Hearing Officer finds claimant does not have the academic abilities to be retrained. Evidence in file indicates that although claimant completed seven years of school, his grades were predominately below average or failing. Dr. Hoover, per report dated 3-4-93 found claimant's short term memory to be poor and claimant's ability to make judgment decisions below average. Dr. Hoover concluded the claimant's aptitude to make appropriate decisions in occupational settings is at the low end of the average adult.
 Although the Hearing Officer notes claimant is a younger person at age 48 years, there is no evidence claimant has the ability to be retrained. Claimant's entire work history consisted of heavy manual type labor with no other skills or on the job training developed. There are no transferable skills from the positions claimant held. Moreover, given claimant's limited educational background and lack of cognitive abilities outlined by Dr. Hoover, the Staff Hearing Officer finds claimant is not a candidate for retraining.
 Therefore the Hearing Officer finds claimant is unable to engage in sedentary work or reasonably be retrained to perform sedentary work. Accordingly, claimant's disability is found to be total in nature and Permanent Total Disability Compensation is granted.
 {¶ 20} 3. On October 9, 2001, relator began serving a three-year prison sentence.
 {¶ 21} 4. On February 8, 2002, the Canton Special Investigations Unit ("SIU") of the Ohio Bureau of Workers' Compensation ("bureau") received information that relator was incarcerated while receiving PTD compensation. This information prompted an SIU investigation.
 {¶ 22} 5. On April 19, 2002, an SIU analyst sent a subpoena to the records officer of the North Central Correctional Institution ("NCCI") where relator was then incarcerated. *Page 10 
 {¶ 23} 6. On April 24, 2002, John Kerschner, R.N., an NCCI employee, wrote to the SIU analyst:
 On October 9, 2001 inmate Asburay entered the prison system via Lorain Correctional Institution. At that time a Health History and Physical was completed. Current health problems that were listed: obese, HTN. Medication: Paxil 40mg. every day, Atenadol 50mg. every day, HCTZ 25mg. every day, Prinivil 10mg. every day. Abnormal findings: Venous Stasis Ulcer left leg, obese. Major health problem: HTN obesity.
 On December 27, 2001, inmate Asburay arrived at North Central Correctional Institution. Inmate Asburay's record was reviewed and was assigned to the Chronic Care Clinic for hypertension. After monitoring his blood pressure his medications were changed to and remains Atenalol 50mg. every day, and HCTZ 25mg. every day. Blood pressure is under control.
 Inmate Asburay does not have any medical restrictions and has not requested any work limitations. Inmate Asburay has not been on any pain medication or muscle relaxers nor has he requested these types of medication.
 {¶ 24} 7. On April 24, 2002, an NCCI "job coordinator" wrote to the NCCI records office as follows:
 Please find attached the information you requested to include:
 work history job descriptions with DOT codes pay history
 Also, I am not able to document the number of hours worked. We do not have time clocks available in every department.
 Pursuant to administrative regulation 5120-3-08, an "average month" consists of twenty-two days for a five-day-per-week assignment. Category six inmates are those in full time assignments of at least one hundred forty hours per month. Category five inmates (porter 5) have an actual work *Page 11 
assignment of ninety to one hundred thirty-nine hours per month.
 This permits a full time work assignment to work an inmate 6.36 hours per day. While all but brand new inmates are in full time assignments, very few are actually working the 6.36 hours per day.
 Pay, for these assignments, is issued on a monthly basis. The month is broken down into quarters, which roughly equate to weeks. If the assignment changes mid-month, so then, does the pay.
 Pay for Asburay, 420-012 since he has been at NCCI is as follows:
 January
 1st quarter $3.00 2nd quarter 3.00 3rd quarter 4.50 4th quarter 4.50 total $15.00
 February
 1st quarter $5.00
 2nd quarter 5.00
 3rd quarter 5.00
 4th quarter 5.00 total $20.00
 March
 1st quarter $5.00
 2nd quarter 5.00
 3rd quarter 5.00
 4th quarter 5.00 total $20.00
 Pay for April will not post until after the first of May. Pay for Asburay will change because his classification changed to student in the middle of April.
 {¶ 25} 8. The SIU analyst also obtained from NCCI three inmate job descriptions for the job titles of porter, food service worker, and pan room coordinator. These three job titles are said to be at pay category 6. *Page 12 
 {¶ 26} 9. According to the inmate job description for porter, the duties of the job are:
 Cleans all areas as assigned. May include sweeping, mopping, dusting, waxing, and removal of trash. May do routine maintenance such as scraping, sanding or painting. May remove trash, maintain restrooms, clean windows, empty ashtrays, and stack chairs. Other duties as assigned.
 {¶ 27} 10. According to the inmate job description for food service worker, the duties of the job are:
 Sweeps and mops floors, washes worktables, walls, refrigerators, and meat blocks. Moves trash and garbage to designated containers. Washes pots, pans and trays. Scrapes food from dirty dishes, and any other duties as assigned.
 {¶ 28} 11. According to the inmate job description for pan room coordinator, the duties of the job are:
 Responsibility for all pots, pans and utensils being cleaned and appropriately maintained after each use. Responsibility for the appropriate number of men needed for each shift in the pot and pan room. Notifies supervisor of all damaged utensils pots and pans. Responsible for sinks being cleaned. Other duties as assigned.
 {¶ 29} 12. The SIU analyst also obtained from NCCI a so-called "inmate job description" for a so-called job title "student academic." The duties of a student academic are:
 Participates in academic school program commensurate with progress and ability levels as measured by standardized testing and guidance counselor evaluation. Program placement may be in Adult Basic Education (ABE) General Education Development (GED) or post secondary college. *Page 13 
 {¶ 30} 13. The SIU analyst prepared a listing of the prison jobs held by relator and the time periods relating to each job. This document indicates that relator held the following jobs during the following periods:

Prison Jobs
Held by [Injured Worker] Time Period
Porter (*Category 6A) 12/28/01 — 1/17/02
Food Service Worker
(*Category 6A) 1 /18/02 — 1 /31 /02
Pan Room Coordinator
(*Category 6C) 2/1/02 — 4/11/02
Student (*Category 6A) 4/12/02 — presently

(Footnote omitted.)
 {¶ 31} 14. In August 2002, SIU posed the following query to bureau physician Edward L. Mitchell, M.D.:
 * * * [D]o the activities the injured worker has/is doing in prison, i.e., working as a porter, food service worker, pan room coordinator and now attending class as a student to acquire his GED, demonstrate the ability to perform sustained remunerative employment? * * *
 In response, on August 15, 2002, Dr. Mitchell wrote:
 Having reviewed the reports of the examining physician, Robert L. Ross, D.C. dated 01-05-96 and having acknowledged his findings that because of health problems and physical limitations, the [injured worker] had no possibility of regular remunerative employment[.]
 Subsequently, review of the medical documentation contained in this file objectively demonstrates that the reports by L. Smith of the North Central Correctional Institution dated 04-24-02 and the progress notes attached to this file dated 10-29-01 through 04-12-02 clearly demonstrate that this [injured worker] has been medically stable on hypertensive medications, required no pain *Page 14 
medications and asked for none, has worked at several 6A pay category jobs requiring sustained work of sweeping, moping [sic], removing trash, maintaining restrooms, food service duties necessitating even more strenuous activities and finally academic efforts to obtain his GED. The Category 6 inmates are those in full time assignments of at least one hundred forty hours per month and he has successfully performed in three such areas of responsibility. After reading carefully the details of the work activities of this [injured worker] since he arrived at the North Central Correctional Center, it is my professional opinion that this [injured worker] can perform sustained remunerative employment.
 Conclusions: Therefore, it is within a reasonable degree of medical certainty that this [injured worker] can perform sustained remunerative employment.
 {¶ 32} 15. On August 23, 2002, the SIU analyst prepared a written report regarding the information, documents and records that she had obtained during her investigation. The report, filed with the commission on August 26, 2002, seeks the following administrative action:
 Based on the evidence obtained by the Canton SIU, it appears that Asburay's activities in prison, i.e., working as a porter, food service worker, and a pan room coordinator demonstrate the ability to perform sustained remunerative employment. Asburay is now a student taking courses to acquire his GED. Therefore, the SIU requests that Permanent Total Disability benefits be found overpaid from 12/28/2001 through the present time, and further benefits be terminated immediately.
 {¶ 33} 16. Following a December 5, 2002 hearing at which no one appeared on behalf of relator, an SHO issued an order terminating PTD compensation and declaring an overpayment effective December 28, 2001. The SHO's order of December 5, 2002 explains:
 The Supreme Court of Ohio, in State ex rel Nicholls v. Industrial Commission (1998), 81 Ohio St.3d 454 and State ex rel Foster v. Industrial Commission (1999), *Page 15 85 Ohio St.3d 320, held that the Industrial Commission of Ohio has continuing jurisdiction where there is probative evidence of 1) new and changed circumstances subsequent to the initial order; 2) fraud in the claim; 3) a clear mistake of fact in the order; 4) a clear mistake of law of such character that remedial action would clearly follow; and/or 5) an error by an inferior administrative tribunal or subordinate hearing officer which renders the order defective.
 Pursuant to said cases, and Ohio Revised Code section 4123.52, this staff hearing officer finds there is jurisdiction to now address the Bureau of Workers' Compensation's motion, filed 8-26-2002, in that new and changed circumstances have occurred since the Industrial Commission awarded the injured worker permanent and total disability benefits.
 It is the order of this staff hearing officer that the Bureau of Workers' Compensation's motion, filed 8-26-2002, requesting that the injured worker be found to be overpaid permanent and total disability benefits paid from 12-28-2001 through the present, and that future permanent and total disability benefits be terminated, is granted to the extent of this order.
 Based on the information in the Ohio Bureau of Workers' Compensation, Canton Special Investigations, Report of Investigation, filed in support of the Bureau of Workers' Compensation motion, and the attachments to said investigative report, this staff hearing officer finds:
 [One] New and changed circumstances have occurred since the claimant was awarded permanent and total disability benefits in 1996;
 [Two] The claimant has been incarcerated from 10-09-2001 through the present;
 [Three] The claimant was paid permanent and total disability benefits for the above period while he was incarcerated;
 [Four] While incarcerated, on 12-28-2001 the claimant commenced engagement in employment activities inconsistent with his status as an adjudicated, permanently and totally disabled person; *Page 16 
 [Five] The claimant received remuneration for said work activities;
 [Six] The claimant was not entitled to receive permanent and total disability benefits once he commenced employment;
 [Seven] The claimant's work activities demonstrate the claimant is capable of engaging in sustained remunerative employment;
 [Eight] The 8-13-2002 medical review from Dr. Edward Mitchell indicates the claimant is medically capable of work activity; and
 [Nine] The 8-19-2002 vocational review of Mr. James M. Beltz indicates the claimant's employment in prison as a porter, food service worker, and pan room coordinator would demonstrate the ability of the claimant to also be capable of employment as a commercial cleaner, general laborer, production assembler, and dining room attendant.
 Therefore, this hearing officer orders that:
 [One] Permanent and total disability benefits are terminated effective 12-28-2001, the date the claimant returned to work;
 [Two] Permanent and total disability benefits were wrongfully paid to the claimant from 12-28-2001 through the present;
 [Three] All permanent and total disability benefits paid to the claimant from 12-28-2001 through the present are declared overpaid; and
 [Four] The claimant is ordered to repay said benefits to the Bureau of Workers' Compensation pursuant to the provisions of Ohio Revised Code Section 4123.511(J).
 {¶ 34} 17. On February 7, 2007, relator moved for relief under R.C. 4123.522 and 4123.52. In his motion, relator claimed that he did not receive notice of the December 5, 2002 hearing and that he did not receive the SHO's order terminating his PTD benefits. *Page 17 
 {¶ 35} 18. Following a March 29, 2007 hearing, an SHO denied relator's motion in its entirety in an order mailed April 4, 2007.
 {¶ 36} 19. On April 6, 2007, relator moved the commission for reconsideration of the SHO's order of March 29, 2007.
 {¶ 37} 20. Following a June 5, 2007 hearing, the three-member commission issued an order that vacates the SHO's order of March 29, 2007 that was mailed April 4, 2007. In its order of June 5, 2007, the commission noted that relator conceded in an affidavit that the notice of the December 5, 2002 hearing was sent to the correct prison address. Accordingly, the commission determined that relator was not entitled to relief regarding the hearing notice.
 {¶ 38} However, the commission did grant relief regarding the post-hearing order that relator claimed he did not receive. The commission granted relator "the opportunity to file a request for reconsideration within 14 days after receipt of this order pursuant to Commission Resolution R05-1-02."
 {¶ 39} 21. Pursuant to the commission's June 5, 2007 order, relator filed a request for reconsideration on July 13, 2007. However, in a lengthy memorandum in support of the motion, relator repeatedly requested reconsideration from the SHO's order mailed April 4, 2007, the very order that the commission's June 5, 2007 order had vacated. While relator did state that he also wanted the SHO's order of December 5, 2002 reheard, he offered no reason for a rehearing other than his allegation that he had not received notice of the December 5, 2002 hearing and thus had been unable to appear and defend the bureau's motion for PTD termination. *Page 18 
 {¶ 40} 22. On November 24, 2007, the commission mailed an order denying relator's July 13, 2007 request for reconsideration.
 {¶ 41} 23. On January 9, 2008, relator, William H. Asburay, filed this mandamus action.
Conclusions of Law: {¶ 42} It is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 43} Effective August 22, 1986, the last paragraph of former R.C. 4123.54(B) was added. That portion of the statute provided: "Compensation or benefits shall not be payable to a claimant during the period of confinement of the claimant in a penal institution."
 {¶ 44} Parenthetically, it can be noted that similar language is currently found at R.C. 4123.54(I) which states: "Compensation or benefits are not payable to a claimant during the period of confinement of the claimant in any state or federal correctional institution."
 {¶ 45} In State ex rel. Brown v. Indus. Comm. (1993),68 Ohio St.3d 45, the injured worker, David C. Brown, was industrially injured on October 25, 1972, prior to the August 22, 1986 amendment of the statute. On September 7, 1982, Brown was awarded PTD benefits.
 {¶ 46} On January 30, 1989, Brown was incarcerated in a penal institution of this state. As a result, the commission suspended PTD compensation, but in its order, advised that Brown could file for reinstatement of benefits following his release from prison. Brown sought a writ of mandamus challenging the suspension of his benefits. *Page 19 
 {¶ 47} In Brown, the court held that the above-quoted language of former R.C. 4123.54 was inapplicable because Brown's date of injury preceded the amendment of the statute. Prior to the August 22, 1986 amendment, the statute was silent with respect to restrictions on the claimant's benefits due to incarceration.
 {¶ 48} In Brown, the court further held that the incarceration did not preclude the continued receipt of PTD compensation. The Brown court contrasted the purposes of temporary total disability ("TTD") compensation with that of PTD compensation. TTD compensation is designed to compensate for lost earnings, while PTD compensation is designed to compensate for total impairment of earning capacity.
 {¶ 49} The Brown court, at 49, explained its holding:
 * * * A finding by the commission that a claimant is permanently and totally disabled is a finding that the claimant is permanently removed from the work force by reason of his or her injury. In a situation where it has been determined that a claimant is entitled to permanent total disability compensation, it is of no consequence that a subsequent event may arise, such as the claimant's incarceration, which may further impair his or her ability to work, because the subsequent event does not negate the causal relationship between the work-related injury suffered by the claimant and his or her absence from the work force. In other words, when a claimant has been determined to be permanently and totally disabled, it is not the subsequent incarceration which prevents the claimant's return to sustained remunerative employment, it is the disability itself.
 {¶ 50} Thus, the Brown court determined that the commission's suspension of PTD compensation was contrary to law and issued a writ of mandamus.
 {¶ 51} The holding in Brown was subsequently applied by the court inState ex rel. Grissom v. Indus. Comm. (1997), 79 Ohio St.3d 311. George Grissom was injured in 1973 and was awarded PTD compensation in 1984. Following his incarceration in *Page 20 
January 1988, the commission suspended PTD compensation. Thereafter, Grissom sought a writ of mandamus to compel reinstatement of his compensation.
 {¶ 52} In Grissom, the commission claimed that the suspension was lawful because the criminal activities that led to Grissom's incarceration may be so inconsistent with his allegation of an inability to perform sustained remunerative employment as to warrant further commission investigation. Rejecting the commission's position, the court explained:
 The record is very sparse. Claimant was originally charged with drug trafficking, aggravated robbery, and attempted murder. The offenses for which he was convicted are not known, nor are the details of the crime(s). However, even if claimant were convicted of all the aforementioned charges, it does not necessarily follow that claimant's commission of drug trafficking, aggravated robbery, or attempted murder establishes a physical ability to perform sustained remunerative employment.
Id. at 312.
 {¶ 53} Two justices dissented in Grissom. Pointing to the commission's continuing jurisdiction over each claim, the dissenting justices opined that evidence of Grissom's criminal activities was justification for the commission to investigate the status of his disability.
 {¶ 54} In State ex rel. Hughes v. Conrad (1998), 83 Ohio St.3d 540, a case not cited by the parties, the court states that the judgment of the court of appeals is affirmed consistent with the opinion of the court of appeals. However, the opinion of the court of appeals was not published.
 {¶ 55} Two justices dissented in Hughes. The dissenting justices opined:
 The 1991 order suspended the claimant's PTD benefits, pursuant to a 1986 amendment to R.C. 4123.54, based on *Page 21 
his incarceration. However, at the time of the hearing in 1991, the record contained an interoffice communication to the warden in the institution where the claimant was incarcerated, dated June 25, 1991, stating that the claimant had been employed in the institution since December 1987. The commission failed to acknowledge this evidence in its order.
 Although this court subsequently found in State ex rel. Brown v. Indus. Comm. (1993), 68 Ohio St.3d 45 * * *, that the suspension of PTD benefits on the basis of incarceration alone was contrary to law where the injury predated the 1986 amendment to R.C. 4123.54, it does not follow, if there is evidence that the claimant is employed while incarcerated, that the PTD award cannot be suspended or terminated on that basis. There is justification for a change or modification of a prior PTD finding if there is evidence produced, subsequent to the original PTD finding, that the claimant is capable of sustained remunerative employment. Here, I believe that the fact of incarceration is irrelevant if the evidence supports a finding that the claimant is presently employed and, therefore, capable of sustained remunerative employment.
 Therefore, I would order the commission to rehear the employer's motion to suspend PTD benefits, and to investigate and seek additional evidence, if necessary, as to the permanent total disability of Hughes. The commission should determine whether Hughes's activities as a clerk in the institution constitute a sufficient change of circumstances to modify the original finding of PTD. See State ex rel. Grissom v. Indus. Comm. (1997), 79 Ohio St.3d 311, 312-313[.] * * *
Id. at 540-541.
 {¶ 56} Citing Brown and Grissom, relator, in effect, claims that those cases prohibit the commission from exercising its continuing jurisdiction over a PTD award during any period of confinement in a state or federal correctional institution. That is, relator suggests that Brown and Grissom prohibit suspension or termination of the award for any reason during the period of confinement. Relator argues: *Page 22 
 This case represents yet another attempt by the Industrial Commission to find some specious reason to terminate the PTD of an inmate in a correctional institution. In the present case the attack taken by the commission is to find that the activities which the Relator engaged in while incarcerated amounted to new and changed circumstances under which the Industrial Commission can exercise its continuing jurisdiction and find said activities to evidence the Relator's engagement in sustained remunerative employment.
(Relator's brief, at 7.)
 {¶ 57} Relator reads Brown and Grissom too broadly. In Brown, the commission suspended the PTD award because of the incarceration. InGrissom, the commission argued that the criminal activities leading to the conviction could become the basis for suspension or termination of the award if those criminal activities are inconsistent with the allegation of an inability to perform sustained remunerative employment.
 {¶ 58} In Hughes, the dissenting opinion indicates that the commission failed to acknowledge in its order evidence that the incarcerated PTD award recipient had been employed in the institution.
 {¶ 59} Unlike the commission's order in Hughes, the instant commission order directly addresses relator's employment during the period of incarceration, and it is that employment that is the basis for termination of the PTD award. Thus, the Hughes case is readily distinguishable from this case.
 {¶ 60} Moreover, neither Brown, Grissom nor Hughes can be read to, in effect, suspend the commission's exercise of continuing jurisdiction over a PTD award during a period of confinement in a penal institution.
 {¶ 61} The lifetime nature of a PTD award does not mean that it is immune from later review. State ex rel. Smothers v. Mihm (1994),69 Ohio St.3d 566, 567-568. If, for *Page 23 
example, the commission learns that the claimant is working or engaging in activity inconsistent with his PTD status, the commission can use its continuing jurisdiction under R.C. 4123.52 to reopen the matter. Id.
 {¶ 62} Continuing jurisdiction is not unlimited. Its prerequisites are: (1) new and changed circumstances; (2) fraud; (3) clear mistake of fact; (4) clear mistake of law; and (5) error by an inferior tribunal.State ex rel. Gobich v. Indus. Comm., 103 Ohio St.3d 585,2004-Ohio-5990.
 {¶ 63} Discovery of evidence subsequent to a PTD award that a claimant is or can engage in sustained remunerative employment is a new and changed circumstance warranting the exercise of continuing jurisdiction.State ex rel. Alesci v. Indus. Comm., 97 Ohio St.3d 210, 2002-Ohio-5932, citing Smothers.
 {¶ 64} In State ex rel. Lawson v. Mondie Forge, 104 Ohio St.3d 39, 41,2004-Ohio-6086, the court states:
 PTD pivots on a single question: Is the claimant capable of sustained remunerative employment? State ex rel. Stephenson v. Indus. Comm. (1987), 31 Ohio St.3d 167, 31 OBR 369, 509 N.E.2d 946. Payment of PTD is inappropriate where there is evidence of (1) actual sustained remunerative employment, State ex rel. Kirby v. Indus. Comm., 97 Ohio St.3d 427, 2002-Ohio-6668, 780 N.E.2d 275; (2) the physical ability to do sustained remunerative employment, State ex rel. Schultz v. Indus. Comm., 96 Ohio St.3d 27, 2002-Ohio-3316, 770 N.E.2d 576; or (3) activities so medically inconsistent with the disability evidence that they impeach the medical evidence underlying the award. See State ex rel. Timmerman Truss, Inc. v. Indus. Comm., 102 Ohio St.3d 244, 2004-Ohio-2589, 809 N.E.2d 15, ¶ 26.
Id. at ¶ 16. (Emphasis sic.)
 {¶ 65} Logically, the fact of incarceration cannot eliminate the possibility that the inmate will demonstrate one or more of the criteria for terminating a PTD award under *Page 24 Lawson. If he does, his incarceration cannot insulate him from the commission's exercise of continuing jurisdiction over his award.
 {¶ 66} The commission's December 5, 2002 order terminating the PTD award states that relator's work activities while in prison demonstrate that he "is capable of engaging in sustained remunerative employment." Thus, the commission's decision appears to be based upon the second prong of the Lawson criteria. The commission did not find that relator was actually engaged in sustained remunerative employment. Rather, it found that the evidence showed a physical ability to perform sustained remunerative employment.
 {¶ 67} The magistrate observes that relator does not challenge the commission's finding that he is capable of engaging in sustained remunerative employment on grounds that the finding is not supported by some evidence relied upon by the commission. Rather, relator claims, as noted above, that Brown and Grissom prohibit the commission from entering a finding that he is capable of engaging in sustained remunerative employment. Accordingly, whether or not the evidence cited by the commission in support of its order constitutes some evidence upon which the commission can rely is not an issue before this court in this action.
 {¶ 68} Accordingly, it is the magistrate's decision that this court deny relator's request for a writ of mandamus. *Page 1